UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SUSSMAN SALES COMPANY, INC.,

                    Plaintiff,

            -v.-

VWR INTERNATIONAL, LLC,

                    Defendant.

20 Civ. 2869 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

        In October 2018, Plaintiff Sussman Sales Company, Inc. ("Sussman")
entered into an agreement (the "Sales Representative Agreement" or the
"Agreement") with Defendant VWR International, LLC ("VWR"), which
agreement appointed Plaintiff to serve as Defendant's sales representative in
connection with the marketing and sale of interactive flat screen devices known
as "Triumph Boards."  According to Plaintiff, it subsequently learned that
Defendant was engaging in bid-rigging and price-fixing of Triumph Boards sold
to New York City schools.  Upon Plaintiff's determination that Defendant had
not adequately addressed this conduct, and amidst other perceived issues with
Defendant's performance, Plaintiff notified Defendant that it was terminating
the Sales Representative Agreement in April 2019.

        Plaintiff proceeded to file this suit, alleging various claims for : (i) breach
of contract; (ii) breach of warranty; (iii) breach of the duty of good faith and fair
dealing; and (iv) fraud.  As a result of Defendant's alleged violations, Plaintiff
seeks: (i) indemnification; (ii) an audit of Defendant's books and records;
(iii) compensatory damages in an amount no less than $11,000,000; and

(iv) punitive damages.  Defendant has now moved for partial dismissal of Plaintiff's Complaint under Federal Rule of Civil Procedure 12(b)(6), seeking to dismiss most of Plaintiff's claims, excluding one breach of contract claim and one breach of warranty claim.  For the reasons that follow, the Court grants Defendant's motion in part and denies it in part.

**BACKGROUND**[1]

A.    **Factual Background**

    1.    **The Parties and the Distribution of Triumph Boards to New York City Schools**

Sussman is a New York company that engages in the sale and distribution of educational materials and educational technology to schools in the New York City area.  (Compl. ¶¶ 19, 21).[2]  VWR is an international distributor of laboratory and scientific products to the government, life science, education, electronics, and pharmaceutical sectors.  (*Id.* at ¶ 23).  In 2014, VWR entered into an agreement with Triumph Board a.s. ("Triumph") to serve

---

[1]    This Opinion draws its facts from Plaintiff's Complaint ("Compl." (Dkt. #2)), the well-pleaded allegations of which are taken as true for purposes of this motion, and the exhibits attached thereto.  *See DiFolco* v. *MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010) ("In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint.").  The October 4, 2018 Independent Sales Representative Agreement between Plaintiff and Defendant is referred to as the "Sales Representative Agreement" (Dkt. #2-1).  Plaintiff's April 3, 2019 notice of the termination of the Agreement is referred to as the "Termination Letter" (Dkt. #2-3).

    For convenience, the Court refers to Defendant's Memorandum of Law in Support of Its Partial Motion to Dismiss as "Def. Br."  (Dkt. #19); Plaintiff's Memorandum of Law in Opposition to Defendant's Partial Motion to Dismiss as "Pl. Opp." (Dkt. #25); and Defendant's Reply Memorandum of Law in Further Support of Its Partial Motion to Dismiss as "Def. Reply" (Dkt. #29).

[2]    References to "Sussman" and "VWR" in the Factual Background pertain to the respective company or its representatives, depending on the context.

as the exclusive U.S. licensee and distributor of Triumph Boards.  (*Id.* at ¶ 24).
As described by Plaintiff, Triumph Boards are interactive white boards
"marketed to schools, among other potential customers."  (*Id.* at ¶¶ 2, 24).

New York City public schools procure supplies and equipment such as
Triumph Boards through three primary methods: (i) through Resolution A
("RESO A"), whereby schools purchase supplies through individual grants at
pre-approved prices;[3] (ii) through an approved vendor listed on the Financial
Accounting Management Information System, or "FAMIS," e-catalog portal at
prices pre-negotiated by the New York City Department of Education ("DOE");
and (iii) where neither of the aforementioned methods is available and absent
any applicable exceptions, through the "three-bid process," in which three
vendors are asked to submit independent bids.  (Compl. ¶ 26).  Sussman's role
in this process, when acting as a company's sales representative, is "often [to]
introduce[] schools to the products [Sussman] represent[s]" and to "then work[]
through the completion of the sale and service[] the customer with problems
with ordering, or post sale service issues."  (*Id.* at ¶ 27).  Customer purchase
orders are generally sent to the product manufacturer or distributor, or
processed through FAMIS.  (*Id.*).

Prior to engaging Sussman, VWR had a contract in place with another
distributor of education technology, Troxell Communications, Inc. ("Troxell"),

---

[3]      "Resolution 'A' (Reso 'A') projects are school specific capital improvement or
enhancement projects that are funded through individual grants which are allocated by
the Borough Presidents or members of the New York City Council."  N.Y.C. School
Construction Authority, http://www.nycsca.org/quick-links-home/projects#Reso-A-32
(last accessed March 25, 2021).

pursuant to which Troxell listed the Triumph Boards for sale on FAMIS. (Compl. ¶ 29).  Additionally, VWR's then-National Sales Manager for Triumph Board Products, Dwayne Johnson, was engaged in direct selling efforts to customers.  (*Id.*).

### 2.    The Sales Representative Agreement

In mid-2018, VWR approached Sussman to gauge the latter's interest in serving as VWR's independent sales representative for Triumph Boards to New York City schools.  (Compl. ¶¶ 28, 30).  Effective October 4, 2018, VWR and Sussman entered into the Sales Representative Agreement, pursuant to which Sussman was appointed as VWR's non-exclusive sales representative for the Triumph Board and related accessories in New York City schools.  (*See* Sales Representative Agreement § 1.1).  In this role, Sussman committed to, among other things, "use its commercially reasonable best efforts … to promote, solicit and obtain orders for [Sussman's] account on behalf of [VWR] … [and] promote the good will and reputation of [VWR]."  (*Id.* at § 2.1).  In return, Sussman was to receive a 10% commission on all Triumph Board sales to schools within New York City, whether or not Sussman was directly or indirectly responsible for the sales.  (*See id.*, Ex. A).[4]

The Sales Representative Agreement placed a number of requirements upon VWR and obligated it to make certain representations.  These included, in relevant part:

---

[4]    At the time of the Sales Representative Agreement, Sussman represented a competing smart board manufacturer, but it was required to cease that representation under the terms of the Agreement.  (Compl. ¶ 3; *see* Sales Representative Agreement 1).

- *First*, VWR was required to provide Sussman with the pricing of its Triumph Board products, and to give Sussman 30-day notice of new pricing.   (Sales Representative Agreement § 1.3).

- *Second*, under Section 3 of the Agreement, VWR's obligations included: (i) "provid[ing] [Sussman] with technical, and training support, sales literature, sales terms and conditions, pricing policies, bulletins, and sales promotional materials, as they are available" (*id.* at § 3.1); and (ii) "promptly notify[ing] [Sussman] of, and mak[ing] available to [Sussman], all upgrades, new editions, error corrections, and new Products … [and] notify[ing] [Sussman] of any intention to discontinue or replace any Product" (*id.* at § 3.2).

- *Third*, the Agreement provided that upon receiving purchase orders written directly to VWR or to its designated reseller customers in New York City, VWR was to "immediately notify" Sussman, and was to pay Sussman its commission within 60 days of the sale.  (*Id.* at § 4.2).  VWR was also required to ship the purchased products "directly to the customer."  (*Id.*).

- *Fourth,* VWR was required to maintain "complete, true and accurate books and records … to enable [Sussman] to calculate and verify Commissions and bonuses due to it" and to permit Sussman to conduct an audit of VWR's applicable sales records upon five days' notice. (*Id.* at § 8.2).

- *Fifth*, VWR made certain warranties pursuant to Section 5.2 of the Agreement, including that (i) it "has complied and will comply with all codes, regulations and laws applicable to its performance pursuant to this Agreement" (*id.* at § 5.2(b)); and (ii) that "there is no litigation pending, and to [its] knowledge, there is no threatened litigation with respect to [its] distribution of the Products and/or relationships with its existing supply chain or distribution chain" (*id.* at § 5.2(c)).

The Sales Representative Agreement provided that it could be terminated "at the election of one party following material breach … by the other party," should the breach not be cured within 30 days "following written notice of such

breach." (Sales Representative Agreement § 6.2).  In the event of termination, all rights granted to Sussman under the Agreement ceased "immediately." (*Id.* at § 6.3).  However, if the Agreement were terminated for reasons other than Sussman's "material breach," Sussman was due commission on all sales placed in the 180 days following its termination of the Agreement. (*Id.*).  The Agreement further provided that certain limited provisions survived its termination.  (*Id.* at § 6.5).

The Sales Representative Agreement also included certain provisions allocating the parties' liability.  Section 6.4 of the Agreement provided that upon termination of the Agreement, Sussman

> will not be entitled to receive any payment from [VWR], whether for actual, consequential, indirect, special or incidental damages, costs or expenses, whether foreseeable (including, but not limited to, claims related to compensation, benefits, loss of profits, investments or good will) … except that [Sussman] shall be entitled to receive any commissions due[.]

(Sales Representative Agreement § 6.4).  Additionally, the Agreement's Indemnification Clause required, among other things, that VWR indemnify Sussman from all claims and damages arising out of:

> (i) any alleged infringement or violation by [VWR] of any … proprietary rights of any third party, or (ii) third party claims related to any claims made by [VWR] about [VWR's] Product, effectiveness or warranty, or (iii) breach by [VWR] of any term or provision of this Agreement, or (iv) wrongful or negligent act or omission by any of [VWR] or its officers, directors, shareholders, agents, servants, employees and representatives.

(*Id.* at § 5.4).

Lastly for these purposes, the Agreement included a merger clause that provided: "This document constitutes the entire agreement and understanding of the parties with respect to the subject matter hereof and supersedes any and all prior negotiations, correspondence, understandings, agreements, duties or obligations between the parties with respect to the subject matter hereof." (Sales Representative Agreement § 8.6).

### 3.  VWR's Relationship with Troxell and Negotiations with CDW

As noted above, prior to its appointment of Sussman as an independent sales representative, VWR had engaged Troxell to list the Triumph Boards on Troxell's FAMIS e-catalog.  (Compl. ¶ 29).  At the time Sussman and VWR negotiated the Sales Representative Agreement, Sussman was told that Troxell might cease listing the Triumph Board on FAMIS, but that in that event, VWR "promptly" would engage another vendor, CDW-G ("CDW"), to step into Troxell's role.  (*Id.* at ¶ 30).  Sussman alleges that Troxell ceased listing the Triumph Board on FAMIS prior to the finalization of the Sales Representative Agreement, but that VWR did not inform Sussman of this development at the time.  (*Id.* at ¶ 31).  Moreover, Sussman alleges that VWR did not commence negotiations with CDW as it had represented to Plaintiff that it would.  (*Id.*).

### 4.  Sussman's Discovery of VWR's Alleged Bid-Rigging

On October 12, 2018, Sussman contacted Dwayne Johnson and Ahmed Mustafa, VWR's Director of Business Development for its Scientific Division, to ask for an "overview of Triumph offerings along with [FAMIS] info" to share with potential customers.  (Compl. ¶ 32; *see also id.*, Ex. D).  Johnson responded

that VWR's FAMIS codes had been "recently removed from the DOE" as Troxell had been "remov[ed]" from its contract.  (*Id.* at ¶ 33).[5]  Johnson explained that until VWR was "relisted" on FAMIS, which might take "another month or two," it was placing orders using the three-bid process.  (*Id.*).  To facilitate that process, Johnson requested that Sussman provide him with a quote using the approved RESO A pricing, and said that he would obtain two additional quotes — "one from a channel partner and the other from our organization" — for Sussman in turn to provide the customer.  (*Id.*).  Sussman understood Johnson's proposal, as described in his email, to involve coordinating the three vendors' bid submissions.  (*Id.* at ¶ 34).  In its response, Sussman said that Johnson's suggested process for collecting bids was "contrary to the way [Sussman did] business."  (*Id.*).

Sussman spoke with Mustafa on a call the same day, and explained its concerns that the conduct proposed by Johnson was both prohibited by DOE regulations and possibly criminal.  (Compl. ¶ 35).  Sussman further observed that the three-bid process could be avoided if the Triumph Board were listed on FAMIS by CDW.  (*Id.*).  Mustafa told Sussman that VWR would resolve the issues with Johnson and pursue the CDW listing.  (*Id.*).[6]

---

[5]     Johnson's email indicates that Triumph Board products had been unavailable on FAMIS for about two weeks.  (Compl. ¶ 33).

[6]     Johnson left VWR in mid-December 2018, but VWR did not replace him until the following month.  (Compl. ¶ 52).  Sussman alleges that during the two to three weeks that Johnson's position was vacant, purchases of Triumph Boards were put on hold by the RESO A office, and that any sales by VWR during this period instead went through the three-bid process.  (*Id.*).

On January 3, 2019, Sussman contacted Blackhawk Group, LLC ("Blackhawk"), VWR's preferred vendor for Triumph Board installation, to request reseller contact information for a customer interested in making a purchase through FAMIS. (Compl. ¶ 53). Blackhawk directed Sussman to request three quotes: (i) the first from Blackhawk; (ii) the second from Universal Learning Solutions LLC ("Universal"), a company controlled by Blackhawk's owners; and (iii) the third from VWR. (*Id.* at ¶ 54). Sussman alleges that it was concerned by Blackhawk's proposal, which directed the customer to three resellers that Sussman perceived as interrelated. (*Id.*). Indeed, Sussman viewed Blackhawk's proposal as an effort to coordinate bidding and steer the contract to VWR. (*Id.* at ¶ 55).[7]

### 5.    Sussman's Report of Bid-Rigging and VWR's Investigation

On February 1, 2019, Sussman sent a letter by email to the "top management" of VWR and its parent company, raising its concerns about VWR's involvement in coordinated bidding with Blackhawk and Universal. (Compl. ¶¶ 58-62). The letter requested "strong assurance" from VWR that its policy prohibiting coordinated bidding would be "strictly followed on sales of Triumph Boards to the New York City schools." (*Id.* at ¶ 62).

Eleven days later, VWR's in-house counsel contacted Sussman, requesting a short delay to conduct an investigation and suggesting that any

---

[7]    Sussman has further alleged that Triumph Board sales records reflect that between October 4, 2018, and December 31, 2018, transactions that were not made through FAMIS, and that were instead made through the three-bid process, involved either VWR, Blackhawk, or Universal. (Compl. ¶ 56). Sussman has concluded that at least ten transactions out of thirty-five conducted by VWR during this roughly three-month period involved bid-rigging and price-fixing. (*Id.* at ¶ 57).

self-reporting to governmental entities would be better done after the completion of the investigation.  (Compl. ¶ 66).  Sussman agreed and shared the relevant underlying email communications with VWR's in-house counsel to aid in the investigation.  (*Id.*).  VWR subsequently hired outside counsel to handle the investigation and any necessary reports to governmental entities. (*Id.* at ¶ 68).

In its conversations with VWR's in-house counsel, Sussman raised a number of concerns, including: (i) its understanding that the CDW contract was in the process of being negotiated; (ii) the failure to notify Sussman of any relevant customer purchase orders received by VWR; and (iii) the failure to pay Sussman for any sales of Triumph Board products.  (Compl. ¶ 67).  On February 24, 2019, Sussman emailed VWR's in-house counsel to stress the time-sensitivity of resolving the process for Triumph Board sales going forward, given the potential issues Sussman had identified with the three-bid process. (*Id.* at ¶ 69).  Sussman explained that it had "potential sales cropping up that it need[ed] to know how to handle[.]"  (*Id.*).

Sussman continued pressing these issues in subsequent discussions with VWR's outside counsel.  (*See* Compl. ¶ 70).  In a call on February 27, 2019, Sussman inquired about the status of negotiations between VWR and CDW (*id.* at ¶ 71), as well as VWR's plans to continue participating in the three-bid process (*id.* at ¶ 73).  Sussman wrote to VWR's outside counsel on March 1, 2019, reiterating these queries, but received no response.  (*Id.* at ¶ 74).  On March 11, 2019, Sussman again contacted VWR's outside counsel to convey

the "urgency" in resolving various issues, including the internal investigation, the plan for the bidding process, as well as the status of the CDW contract.  (*Id.* at ¶ 81).  VWR's outside counsel responded the same day, stating that they were "still working on the process going forward and expect to have it finalized soon," and that they did not know the status of the CDW negotiations, but that "as soon as [they had] something to report on that, [they would do so]."  (*Id.* at ¶ 82).[8]

### 6.     Sussman's Discussion with CDW and Termination of the Sales Representative Agreement

On March 15, 2019, following its repeated efforts to request updates on the status of VWR's discussions with CDW, Sussman contacted CDW's New York District Manager to inquire about its negotiations with VWR.  (Compl. ¶ 83).  Sussman's contact at CDW indicated that CDW was not willing to list the Triumph Board on its FAMIS e-catalog, due to perceived issues with the product's service and quality.  (*Id.* at ¶ 84).  Based on this conversation, Sussman's understanding was that there were no ongoing negotiations

---

[8]     During this time, Sussman was also experiencing issues with VWR's sales notification and commission payment practices.  On March 5, 2019, Sussman contacted VWR to report that while it had received a check for commission payments for October 2018, there was no detail provided regarding the calculation of the payments, and Sussman also had not received any reports or details on sales made during November and December 2018, or January 2019.  (Compl. ¶ 75).  Sussman was not notified of any direct sales by VWR or its authorized resellers until VWR issued a report on March 7, 2019, which summarized direct sales made between October 4, 2018, through December 31, 2018 (the "March 2019 Report").  (*Id.* at ¶¶ 45, 78).  Towards the end of March 2019, VWR attempted to correct certain errors on its March 2019 Report, and belatedly sent certain customer purchase orders to Sussman.  (*Id.* at ¶ 90).  However, Sussman alleges that VWR has provided neither a complete and comprehensive report of its direct sales, nor the official customer purchase orders on all sales.  (*Id.* at ¶¶ 47-48, 90).  Sussman posits that VWR's delayed and incomplete reporting of its direct sales was a means of concealing its bid-rigging conduct from Sussman.  (*Id.* at ¶¶ 51, 79).

between VWR and CDW at the time, and that there had not been any such discussions during the 2018-2019 school year. (*Id.* at ¶ 83). In a call between Sussman and VWR later the same day, VWR claimed it was still negotiating with CDW. (*Id.* at ¶ 85). When pressed on the details of the negotiation, VWR admitted that there were no negotiations "in progress," but that VWR had sent emails to CDW seeking to initiate such discussions, to which CDW had yet to respond. (*Id.*). Sussman informed VWR of its call with CDW, and VWR "did not deny the fact that CDW was unwilling to list Triumph Boards on FAMIS." (*Id.* at ¶ 86).

Later the same day, Mustafa sent Sussman an email that indicated that purchases of Triumph Boards would need to be made using the three-bid process "until [VWR was] listed back in FAMIS[.]" (Compl. ¶ 87). The email enclosed a list of five resellers that Sussman could approach for quotes if needed. (*Id.*). However, VWR did not provide Sussman with any assurance that there were be no coordination or communications between the resellers concerning proposed bids. (*Id.* at ¶ 89).

On April 3, 2019, Sussman sent VWR a letter providing formal notice of its termination of the Sales Representative Agreement. (Compl. ¶ 91; *see also* Termination Letter). The Termination Letter detailed a number of putative breaches of warranties and of contract provisions by VWR, and further demanded an audit pursuant to Section 8.2 of the Sales Representative Agreement. (Compl. ¶ 92). Counsel for VWR responded to the Termination Letter on April 18, 2019, in a letter retorting that Sussman's claims of breaches

of the Agreement were "factually and legally without basis, in addition to being late[.]" (*Id.* at ¶ 93; *see also id.*, Ex. E).  VWR's counsel further asserted that "it is Sussman, rather than VWR, who has failed to uphold their end of the bargain" as "Sussman has failed to make any notable effort to ... market and sell Triumph Board products into NYC schools." (*Id.* at ¶ 93).  The letter also stated that VWR's counsel was still in the process of investigating Sussman's bid-rigging allegations, although Sussman alleges that VWR had concluded its investigation at that point.  (*Id.* at ¶¶ 94-95).  While the letter represented that VWR was "open to entertain a settlement," subsequent attempts at resolution failed, leading Sussman to commence this action.  (*Id.* at ¶ 103).

### 7.    Plaintiff's Allegations

Plaintiff has brought eight claims for relief, which can be grouped into three categories: (i) Defendant's alleged coordination of the three-bid process; (ii) Defendant's representations regarding its ability to list Triumph Boards on the FAMIS e-catalog; and (iii) Defendant's compliance with various other express or implied requirements of the Sales Representative Agreement. (Compl. ¶¶ 104-60).  Defendant has moved to dismiss the majority of Plaintiff's claims, excluding (i) Claim One, alleging Defendant's breach of its warranty of compliance with the law (*id.* at ¶¶ 104-08); and (ii) a component of Claim Five, alleging Defendant's breach of its obligation to notify Plaintiff of applicable purchases and to pay Plaintiff any commissions due (*id.* at ¶¶ 126-29).  The claims implicated by the instant motion include:

> i.    Claim Two, in which Plaintiff alleges that it was induced into signing the Agreement by Defendant's fraudulent

misrepresentations and omissions regarding its relationship with Troxell and CDW.  (*Id.* at ¶¶ 109-13).

ii.     Claim Three, where Plaintiff further alleges that it was induced into continuing its contract with Defendant by Defendant's misrepresentations about the status of its negotiations with CDW between October 2018 and mid-March 2019.  (*Id.* at ¶¶ 114-18).[9]

iii.    Claim Four, where Plaintiff contends that Defendant breached the warranty that there was no pending or threatened litigation with respect to its "distribution of [Triumph Boards] and/or relationships with its existing supply chain or distribution chain" provided in Section 5.2(c) of the Agreement.  (*Id.* at ¶¶ 119-24).

iv.     Claim Five, which, as relevant to this motion, encompasses six perceived breaches of the Sales Representative Agreement by Defendant, including breaches regarding (a) notification of price changes (*id.* at ¶ 130); (b) provision of sales literature and promotional materials (*id.* at ¶¶ 131-35); (c) notification of customer inquiries, customer interest in purchases, and complaints (*id.* at ¶¶ 136-40); (d) delivery of Triumph Boards (*id.* at ¶¶ 141-43); (e) delivery of defective Triumph Boards (*id.* at ¶¶ 144-46); and (f) warranties provided to Plaintiff's customers (*id.* at ¶¶ 147-49).

v.      Claim Six, where Plaintiff alleges that Defendant's breaches of its warranties and contractual obligations constituted a breach of the duty of good faith and fair dealing.  (*Id.* at ¶¶ 150-52).

vi.     Claim Seven, where Plaintiff seeks indemnification of damages, liabilities, and costs resulting from Defendant's aforementioned conduct, pursuant to the Agreement's indemnification provision.  (*Id.* at ¶¶ 153-56).

---

[9]    As discussed further below, in its opposition briefing, Plaintiff seeks to expand the scope of Claims Two and Three to encompass allegations that Defendant made false representations related to Defendant's bid-rigging and price-fixing in connection with the three-bid process.  (Pl. Opp. 7, 9).

vii.    Lastly, Claim Eight, where Plaintiff seeks a mandatory injunction compelling Defendant to permit an audit of its sales of Triumph Boards in New York City, pursuant to Section 8.2 of the Agreement. (*Id.* at ¶¶ 157-60).

## B.    Procedural Background

Plaintiff commenced this action on April 7, 2020, with the filing of its Complaint. (Dkt. #2). On May 19, 2020, Defendant submitted a letter to the Court seeking leave to file a partial motion to dismiss (Dkt. #14), to which Plaintiff responded on May 22, 2020 (Dkt. #15), and Defendant filed a reply letter on May 24, 2020 (Dkt. #16). On May 26, 2020, the Court issued an Order granting Defendant's application, and setting a briefing schedule for Defendant's motion. (Dkt. #17). The Court further stayed all discovery pending resolution of the motion. (*See id.*).

On June 26, 2020, Defendant filed its partial motion to dismiss and supporting documents. (Dkt. #18-20). Plaintiff filed its opposition brief on August 3, 2020. (Dkt. #25).[10] Briefing was completed with the filing of Defendant's reply brief on August 17, 2020. (Dkt. #29).[11]

---

[10]    Plaintiff filed an initial opposition brief on July 24, 2020 (Dkt. #21), which brief was subsequently stricken from the record for exceeding the applicable page limit set forth in the Court's Individual Rule of Practice 4(B) (*see* Dkt. #22).

[11]    Prior to the filing of Defendant's reply brief, on August 13, 2020, Plaintiff requested that the Court lift its stay on discovery and order the parties to engage in a conference pursuant to Federal Rule of Civil Procedure 26(f) (Dkt. #26), which request Defendant opposed the following day (Dkt. #27). On August 14, 2020, the Court issued an Order denying Plaintiff's request, but assuring Plaintiff that a discovery schedule would promptly be set upon the resolution of the pending motion. (Dkt. #28).

## DISCUSSION

**A.     Applicable Law**

### 1.     Motions to Dismiss under Federal Rule of Civil Procedure 12(b)(6)

Under Rule 12(b)(6), a defendant is permitted to move that the plaintiff's action be dismissed for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When considering a motion to dismiss under Rule 12(b)(6), a court must "draw all reasonable inferences in Plaintiff's favor, 'assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief.'" *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (quoting *Selevan* v. *N.Y. Thruway Auth.*, 584 F.3d 82, 88 (2d Cir. 2009)); *see also Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009). However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678; *see also Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 555 (2007) (noting that a court is "not bound to accept as true a legal conclusion couched as a factual allegation" (quoting *Papasan* v. *Allain*, 478 U.S. 265, 286 (1986))). A plaintiff is entitled to relief if he alleges "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see also In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) ("While *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [plaintiff's] claims across the line from conceivable to plausible.'" (quoting *Twombly*, 550 U.S. at 570)).

### 2.   Contract Interpretation Under New York Law[12]

"It is axiomatic under New York law ... that the fundamental objective of contract interpretation is to give effect to the expressed intentions of the parties." *Lockheed Martin Corp.* v. *Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011) (internal quotation marks and citation omitted).  It is well established that the parties' intentions are generally discerned from the four corners of the document itself.  *MHR Cap. Partners LP* v. *Presstek, Inc.*, 12 N.Y.3d 640, 645 (2009).

Under New York law, the interpretation of a contract "is a matter of law for the court to decide."  *Int'l Multifoods Corp.* v. *Commercial Union Ins. Co.*, 309 F.3d 76, 83 (2d Cir. 2002) (internal citation omitted).  When interpreting an unambiguous contract, "the court is to consider its '[p]articular words' not in isolation 'but in light of the obligation as a whole and the intention of the parties manifested thereby.'"  *JA Apparel Corp.* v. *Abboud*, 568 F.3d 390, 397 (2d Cir. 2009) (quoting *Kass* v. *Kass*, 91 N.Y.2d 554, 566 (1998)).  In addition, a contract should not be interpreted so as to render a clause superfluous or meaningless.  *Galli* v. *Metz*, 973 F.2d 145, 149 (2d Cir. 1992).

### B.   Analysis

#### 1.   The Court Grants Defendant's Motion to Dismiss Claim Two and Claim Three

As previewed above, Plaintiff alleges two fraud claims: fraud in the inducement of the Agreement (Claim Two) and fraud to avoid the Agreement's

---

[12]   New York law governs the instant dispute pursuant to the choice of law provision of the Agreement.  (*See* Sales Representative Agreement § 8.4).

termination (Claim Three).  Defendant advances several arguments for dismissal of these claims.  *First*, Defendant argues that Claim Two is barred pursuant to the Agreement's merger clause.  (Def. Br. 9-11 (discussing Sales Representative Agreement § 8.6)).  *Second*, Defendant argues that both claims are duplicative of Plaintiff's breach of warranty claims.  (*Id.* at 11-12).  *Third*, Defendant asserts that Plaintiff has failed to allege either a false statement by Defendant, or reasonable reliance by Plaintiff on any false statement, as required to plead a fraud claim.  (*Id.* at 12-14).  The Court will address each argument in turn.[13]

Fraud claims are subject to a "heightened pleading standard" under Federal Rule of Civil Procedure 9(b), *Rombach* v. *Chang*, 355 F.3d 164, 171 (2d Cir. 2004), which rule specifies that a plaintiff must "state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  A

---

[13]     In its opposition brief, Plaintiff seeks to expand Claims Two and Three to encompass Defendant's allegedly false representations regarding its bid-rigging conduct.  (Pl. Opp. 7-9).  Specifically, Plaintiff argues that, in executing the Agreement, Defendant falsely represented that it "has complied and will comply with all codes, regulations, and applicable laws," which representation was false given Defendant's conduct.  (Pl. Opp. 7 (quoting Sales Representative Agreement § 5.2(b))).  However, as actually pleaded in the Complaint, both claims arise from Defendant's misrepresentations regarding its ability to list the Triumph Boards on the FAMIS e-catalog through Troxell and CDW, rather than from Defendant's misrepresentations as to the extent to which its participation in the three-bid process complied with the law.  (*See* Compl. ¶¶ 109-18).  While Plaintiff argues that its allegations regarding Defendant's representations as to "the absence of illegal conduct" were "expressly repeated and re-alleged" in Claims Two and Three (Pl. Opp. 7), it supports this argument by citing allegations in the Complaint that are not in fact expressly referenced in connection with its fraud claims (*compare* Compl. ¶¶ 1, 4, 5, 51, 89, *with id.* at ¶¶ 109-18), but rather are referenced in connection with other claims (*see id.* at ¶¶ 104-08, 150-52).  As such, at the outset, the Court rejects Plaintiff's arguments to the extent they are premised upon an unsupported and overbroad view of Claims Two and Three.  *See Enzo Biochem, Inc.* v. *Amersham PLC*, 981 F. Supp. 2d 217, 223 (S.D.N.Y. 2013) ("It is well settled that a party may not amend its pleadings in its briefing papers."); *O'Brien* v. *Nat'l Prop. Analysts Partners*, 719 F. Supp. 222, 229 (S.D.N.Y. 1989) ("[I]t is axiomatic that the complaint cannot be amended by the brief in opposition to a motion to dismiss[.]").

complaint predicated upon fraud must "[i] specify the statements that the plaintiff contends were fraudulent, [ii] identify the speaker, [iii] state where and when the statements were made, and [iv] explain why the statements were fraudulent." *Rombach*, 355 F.3d at 170 (citation omitted).  Under New York law, to state a claim for fraud or fraudulent inducement, a plaintiff must demonstrate that "[i] the defendant made a material false representation, [ii] the defendant intended to defraud the plaintiff thereby, [iii] the plaintiff reasonably relied upon the representation, and [iv] the plaintiff suffered damage as a result of such reliance." *Wall* v. *CSX Transp. Inc.*, 471 F.3d 410, 415-16 (2d Cir. 2006) (citation omitted).

### a.   Claim Two and the Merger Clause

As noted above, Claim Two relates to Plaintiff's allegations that it was fraudulently induced into signing the Agreement.  (Compl. ¶¶ 109-13).  In the Complaint, Plaintiff alleges that this claim arises from Defendant's misrepresentations regarding the status of its relationship with Troxell, its negotiations with CDW, and the resulting impact on its ability to distribute Triumph Boards on FAMIS.  (*Id.* at ¶¶ 110-12).  Defendant counters that the Agreement's merger clause forecloses the reasonableness of any reliance on these alleged misrepresentations.  (Def. Br. 9-10).  The merger clause, contained in Section 8.6 of the Agreement, states: "This document constitutes the entire agreement and understanding of the parties with respect to the subject matter hereof and supersedes any and all prior negotiations, correspondence, understandings, agreements, duties or obligations between

19

the parties with respect to the subject matter hereof." (Sales Representative Agreement § 8.6).

Defendant first argues that this merger clause, when read together with certain representations in the Agreement, functions as a bar on Plaintiff's claim for fraudulent inducement stemming from misrepresentations about the status of its relationship with CDW and Troxell. (Def. Br. 9-10). Specifically, Defendant refers the Court to Section 5.2 of the Agreement, pursuant to which Defendant represented that there was no threatened or pending litigation regarding its distribution chain. (*Id.* at 9 (referencing Sales Representative Agreement § 5.2)). Defendant argues that because the Agreement contains a specific representation regarding the distribution chain, Plaintiff cannot now pursue a fraud claim based on an alleged misrepresentation relating to the distribution chain. (*Id.*). In support, Defendant refers the Court to *Harsco Corp.* v. *Segui*, 91 F.3d 337, 345 (2d Cir. 1996), in which case the Second Circuit reiterated the rule originally announced by the New York Court of Appeals in *Danann Realty Corp.* v. *Harris*, 5 N.Y.2d 317 (1959): "[W]here a party specifically disclaims reliance upon a particular representation in a contract, that party cannot, in a subsequent action for common law fraud, claim it was fraudulently induced to enter into the contract by the very representation it has disclaimed reliance upon." 91 F.3d at 345.

In *Harsco*, the Second Circuit applied the *Danann* rule to find that the parties' merger clause barred various theories of fraud, 91 F.3d at 345-47, including, for example, allegations of fraud based on an alleged representation

that a property would be acquired by June or July 1993, where the agreement itself contained a representation that the property would not be acquired until September or October 1993, *id.* at 347.  Here, in contrast to *Harsco*, the representation in Section 5.2 does not give rise to Plaintiff's claim — Plaintiff does not allege merely that Defendant misrepresented the threat of litigation, but that Defendant misrepresented its ability to list and sell Triumph Boards through FAMIS.  *See id.* at 345-47; *see also Aetna Cas. & Sur. Co.* v. *Aniero Concrete Co.*, 404 F.3d 566, 575-76 (2d Cir. 2005) (observing that while "there need not be a precise identity between the misrepresentation and the particular disclaimer ... the substance of the disclaimer provisions [must] track[] the substance of the alleged misrepresentation, notwithstanding semantical discrepancies" (internal quotation marks and citations omitted)).  The Court does not read Defendant's representation in Section 5.2 regarding pending or threatened litigation to "track" the alleged misrepresentations regarding Defendant's ability to distribute on FAMIS.[14]  As such, the Court is disinclined to find that the merger clause, in conjunction with Section 5.2, necessarily functions to bar *any* fraud claim based on alleged representations about Defendant's distribution channel.[15]

---

[14]  Although Plaintiff does argue in connection with Claim Four that the termination of Defendant's relationship with Troxell and the status of its negotiations with CDW posed a known threat of litigation, this does not impact the Court's analysis.  (*See* Pl. Opp. 13-14).  Rather, as the Court will make clear when it turns to Claim Four, neither Plaintiff nor Defendant benefits from attempting to connect Defendant's alleged misrepresentations regarding Troxell and CDW with the warranties in Section 5.2 of the Agreement.

[15]  Defendant's reference to *Transnational Management Systems II, LLC* v. *Carcione*, No. 14 Civ. 2151 (KBF), 2016 WL 7077040 (S.D.N.Y. Dec. 5, 2016), does not change the Court's views, as there, too, the district court found that plaintiff "had no basis" to

Defendant next argues that even in the absence of an applicable express disclaimer, the merger clause nonetheless bars Plaintiff's fraud claim because it was negotiated by sophisticated entities with ready access to information. (Def. Br. 10-11).  Defendant is correct that courts consider the sophistication of the parties in assessing the reasonableness of a plaintiff's alleged reliance, as well as other "factors such as [the transaction's] complexity and magnitude … and the content of any agreements between [the parties]." *Emergent Cap. Inv. Mgmt., LLC* v. *Stonepath Grp., Inc.*, 343 F.3d 189, 195 (2d Cir. 2003).  Where the parties' agreement includes a merger clause, courts look to "'the entire context of the transaction' to determine whether a plaintiff's reliance on an extra-contractual representation is reasonable." *Alpha Cap. Anstalt* v. *Schwell Wimpfheimer & Assocs. LLP*, No. 17 Civ. 1235 (GHW), 2018 WL 1627266, at *13 (S.D.N.Y. Mar. 30, 2018).  On this point, Defendant cites to two cases where district courts were persuaded that the parties' inclusion of "extensive and exclusive representations and warranties," in addition to a merger clause, was sufficient to bar a fraud claim.  (*See* Def. Br. 10 (citing *Consolidated Edison, Inc.* v. *Ne. Utilities*, 249 F. Supp. 2d 387, 403 (S.D.N.Y. 2003), *rev'd in part on other grounds*, 426 F.3d 524 (2d Cir. 2005); *Primedia Enthusiast Publ'n Inc.* v. *Ashton Int'l Media, Inc.*, No. 02 Civ. 9997 (HB), 2003 WL 22220375, at *6 (S.D.N.Y. Sept. 25, 2003) (observing that where plaintiff had "assembled a

---

argue that it had relied on a fraudulent misrepresentation that was specifically disclaimed by the agreement's integration clause.  2016 WL 7077040, at *7.  Here, the Court does not find that Plaintiff disclaimed reliance on the alleged misrepresentations underlying Claim Two.

team" with "expertise" and negotiated "numerous other representations and warranties," "no juror could reasonably conclude that [plaintiff] justifiably relied on the alleged oral misrepresentation")).  Here, in contrast, the Agreement includes a single limited section with the parties' warranties and representations (*see* Sales Representative Agreement §§ 5.1 and 5.2), coupled with a general merger clause (*see id.* at § 8.6).

Separately, the Second Circuit has found that in certain circumstances, a sophisticated party cannot show reasonable reliance even where (i) a contract contains no specific disclaimer of reliance on oral representations and (ii) the alleged misrepresentation concerned a matter "peculiarly within" the other party's knowledge.  *Lazard Freres & Co.* v. *Protective Life Ins. Co.*, 108 F.3d 1531, 1542 (2d Cir. 1997).  In those cases, the Court has explained that where the party was "put on notice of the existence of material facts which have not been documented and he nevertheless proceeds with a transaction without securing the available documentation or inserting appropriate language in the agreement for his protection," "the party may truly be said to have willingly assumed the business risk that the facts may not be as represented."  *Id.* at 1543.  Where the plaintiff in *Lazard Freres* alleged misrepresentations about the contents of a document that it knew existed but did not have the opportunity to review, the Court found that the plaintiff, as a sophisticated party, should have, and could have, protected itself from the misrepresentations by demanding to see the document prior to the agreement's finalization.  *Id.* at 1543-44.  Transferring that analysis here, the Court

observes that Plaintiff alleges that it had decades of acquired experience and "expertise" distributing educational materials in the New York area (Compl. ¶¶ 21, 27), and familiarity with the "complex" process of selling products to New York City schools (*id.* at ¶ 26). Prior to entering into the Agreement, Plaintiff was made aware that the status of Defendant's relationship with Troxell and CDW was in flux (*id.* at ¶ 30), and could have protected itself by insisting that the Agreement include representations regarding Defendant's ability to list products on FAMIS. *See Lazard Freres*, 108 F.3d at 1543; *see also Emergent Cap. Inv. Mgmt., LLC*, 343 F.3d at 196; *Century Pac., Inc.* v. *Hilton Hotels, Corp.*, 354 F. App'x 496, 498-99 (2d Cir. 2009) (summary order).

More recently, however, the Second Circuit has distinguished prior cases in which it found that a plaintiff could have "protected itself by insisting that this representation be included in the … agreement." *FIH, LLC* v. *Found. Cap. Partners LLC*, 920 F.3d 134, 143-44 (2d Cir. 2019) (quoting *Emergent Cap. Inv. Mgmt., LLC*, 343 F.3d at 195). The Court observed that, in *Emergent Capital*, "the parties actually negotiated factual representations to be included in the written agreements that suggest a closed set of such representations upon which the plaintiff's reliance was acknowledged." *Id.* at 144. In contrast, in the agreement at issue in *FIH*, the negotiated terms "relate[d] to the parties' *obligations*, and [did] not constitute affirmative *factual* representations of any kind." *Id.* Based on the lack of factual representations in the agreement, as well as the fact that the agreement's general merger clause "contain[ed] no disclaimer of any kind of representation, and the subject matter of defendants'

alleged misrepresentations was not addressed by affirmative representations in any agreement between the parties," the Second Circuit determined that a finding of reasonable reliance upon defendant's misrepresentations was not precluded.  *Id.*  However, the Court cautioned that "there may be circumstances where a general disclaimer or merger clause, together with an extensive roster of specifically negotiated factual warranties and representations, can lead to a conclusion that, in the particular circumstances of a case, no reasonable jury could find reasonable reliance on a representation not inserted into the written contract."  *Id.* at 145.

Here, as in *Lazard Freres*, Plaintiff is a sophisticated party with experience in the subject matter of the contract and notice of the issues that give rise to the current alleged misrepresentations.  And here, unlike in *FIH*, the parties negotiated limited factual warranties and representations.  For these reasons, and despite the facts that (i) the Agreement does not reflect extensively negotiated representations or warranties and (ii) the merger clause does not disclaim any particular type of factual representation, Plaintiff may nonetheless be foreclosed from pleading reliance on Defendant's alleged misrepresentations.  However, the Court need not make such a finding, as Claim Two must be dismissed on other grounds raised by Defendant.

> **b.    Claims Two and Three Are Not Duplicative of Plaintiff's Breach of Warranty Claims**

Defendant next argues that Claims Two and Three are barred as duplicative of Plaintiff's breach of warranty claims brought under Claims One

and Four.  (Def. Br. 11-12).[16]  Plaintiff retorts that its fraud claims are extraneous to the contract and seek different damages.  (Pl. Opp. 10-13).

"It is black letter law in New York that a claim for common law fraud will not lie if the claim is duplicative of a claim for breach of contract." *EQT Infrastructure Ltd.* v. *Smith*, 861 F. Supp. 2d 220, 233 (S.D.N.Y. 2012) (citation omitted).  To maintain a separate claim for fraud, a plaintiff must "[i] demonstrate[] a legal duty separate from the duty to perform under the contract; [ii] point[] to a fraudulent misrepresentation that is collateral or extraneous to the contract; or [iii] seek[] special damages that are unrecoverable as contract damages." *Merrill Lynch & Co.* v. *Allegheny Energy, Inc.*, 500 F.3d 171, 183 (2d Cir. 2007).  In determining whether a fraud claim is duplicative of a contract claim, New York courts "distinguish[] between a promissory statement of what will be done in the future that gives rise only to a breach of contract cause of action and a misrepresentation of a present fact that gives rise to a separate cause of action for fraudulent inducement." *Id.* at 184.

Defendant argues that Plaintiff's fraud claims are "inextricably intertwined" with its breach of warranty claims, and allege no

---

[16]   Defendant also argues that Plaintiff's fraud claims are barred by the economic loss doctrine.  (Def. Br. 11-12).  However, a number of courts in this District have determined that New York's economic loss doctrine does not apply to intentional torts such as fraud, and have refrained from dismissing fraud claims on this basis.  *See, e.g.*, *Fed. Deposit Ins. Corp. ex rel. First NBC Bank* v. *Murex LLC*, No. 16 Civ. 7703 (PAE), 2018 WL 2694431, at *8 (S.D.N.Y. June 5, 2018); *see also Weisblum* v. *Prophase Labs, Inc.*, 88 F. Supp. 3d 283, 297 (S.D.N.Y. 2015) (collecting cases).  In any event, the Court need not consider this argument in its analysis of Plaintiff's fraud claims, as they will be dismissed on a separate basis.

misrepresentations collateral or extraneous to the contract.  (Def. Br. 11; Def. Reply 2-3).  In response, Plaintiff argues that its fraud claims are not duplicative as they involve misrepresentations of "present fact" rather than "future intent."  (Pl. 11-12 (citing *RGH Liquidating Tr.* v. *Deloitte & Touche LLP*, 851 N.Y.S.2d 31 (1st Dep't 2008))).  In particular, Plaintiff asserts that Claim Two is based on Defendant's knowledge and conduct at the time it entered into the Agreement, while Claim Three is based on Defendant's false representations made during the course of the Agreement.  (*Id.*).  As explained herein, the Court agrees that Plaintiff's fraud claims need not be dismissed as redundant.

The Court first addresses Defendant's argument that Claims One and Two are duplicative, beginning with a review of the allegations in each.  Claim One alleges Defendant's breach of its warranty regarding its compliance with the law, in light of Plaintiff's subsequent discovery that Defendant was engaged in bid-rigging at the time.  (Compl. ¶¶ 104-08).  In contrast, Claim Two alleges that Plaintiff was induced into signing the Agreement by Defendant's fraudulent misrepresentations and omissions regarding its relationship with Troxell and CDW.  (*Id.* at ¶¶ 109-13).[17]  *First,* as discussed above, the alleged misrepresentations that give rise to Claim Two are not addressed by any

---

[17]   As noted above, although Plaintiff attempts to broaden Claim Two to encompass its bid-rigging allegations in its opposition brief, the Court's understanding of Claim Two derives from the actual text of the Complaint.  Moreover, the Court agrees with Defendant that any attempt to broaden Claim Two to encompass Plaintiff's bid-rigging allegations would render it duplicative of Claim One, and subject to dismissal on that basis.

specific warranties or representations in the Agreement.  Rather, Defendant's
warranties in the Agreement are limited to representations that Defendant was
in compliance with all applicable laws and regulations, and that Defendant was
not aware of any pending or threatened litigation related to its distribution
chain.  (*See* Sales Representative Agreement § 5.2).  The allegations put forth in
support of Claim Two do not pertain to either of those representations.
Accordingly, the Court finds that the misrepresentations underlying Claim Two
transcend promises to signify "mere undertaking to perform [Defendant's]
contractual obligations."  *Aero Media LLC* v. *World Healing Ctr. Church, Inc.*,
No. 12 Civ. 5196 (LLS), 2013 WL 2896856, at *5 (S.D.N.Y. June 11, 2013)
(allowing fraud in the inducement claim to proceed where the promises made
went beyond what was reduced to writing in the contract).  *Second,* Plaintiff
alleges that it would not have entered into the Agreement had it known "the
undisclosed facts concerning Troxell and CDW" (*id.* at ¶ 112), suggesting a
"separate and distinct claim for fraud in the inducement."  *See Alpha Cap.
Anstalt* v. *Oxysure Sys., Inc.*, 252 F. Supp. 3d 332, 340 (S.D.N.Y. 2017)
(observing that defendant had made alleged misrepresentations prior to the
contract, rather than in conjunction with the already executed contract).
*Third*, Defendant allegedly misrepresented present facts, rather than a promise
of future intent, as required to distinguish a fraud claim.  Specifically,
Defendant allegedly failed to disclose that Troxell had ceased to list Triumph
Boards on FAMIS.  (Compl. ¶¶ 30-31).  *See Merrill Lynch & Co.*, 500 F.3d at

184.  The Court is persuaded that these allegations support a distinct fraud in the inducement claim.

The Court next turns to Claim Three, which Defendant argues is duplicative of Claim Four.  As noted above, Claim Three alleges that Plaintiff was induced to continue operating under the Agreement by Defendant's misrepresentations about the status of its negotiations with CDW between October 2018 and mid-March 2019.  (Compl. ¶¶ 114-18).  In Claim Four, Plaintiff alleges that Defendant breached the warranty provided in Section 5.2 of the Agreement that there was no pending or threatened litigation with respect to Defendant's "distribution chain."  (*Id.* at ¶¶ 119-24).  For similar reasons as those discussed above, the Court views Claim Three as distinct from Claim Four.  Once again, the alleged misrepresentations underlying Claim Three are not addressed by either Section 5.2 or any other provision of the Agreement.  Defendant's misrepresentations about the status of its negotiations with CDW related to its ability to list Triumph Boards on FAMIS. There is no basis to infer from the Complaint that the status of these discussions would necessarily lead to pending or threatened litigation as to Defendant's distribution chain.  The Court thus rejects Defendant's argument that Claim Three should be dismissed as duplicative.[18]

---

[18]   Although Plaintiff submits that Claims Two and Three are not duplicative for an additional reason — that they seek punitive damages — Defendant raises a number of arguments in its briefing against the availability of punitive damages.  (Def. Br. 23-25; Def. Reply 5-7).  The Court need not decide this issue, first because Plaintiff has provided sufficient bases for deeming Claims Two and Three non-duplicative, and second because Claims Two and Three are dismissed on separate grounds.

### c.     Claims Two and Three Fail to Plead Material Misrepresentations and Reliance

Ultimately, however, the Court accepts Defendant's last basis for dismissal of Claims Two and Three, namely, that Plaintiff has failed to allege a false statement upon which Plaintiff reasonably relied.  (Def. Br. 12-14).  *See Wall*, 471 F.3d at 415-16.  Defendant argues that, as alleged in the Complaint, Plaintiff was aware both that Troxell might stop selling Triumph Boards and that Defendant was attempting to engage CDW as a replacement for Troxell. (*Id.*).  Defendant further argues that even if Plaintiff were misled about the status of Defendant's negotiations with CDW, Plaintiff cannot rely "on statements regarding events outside [Defendant's] control."  (*Id.* at 13).  In response, as to Claim Two, Plaintiff asserts that Troxell had stopped listing the Triumph Boards on FAMIS before the Agreement was signed, and that this information was not disclosed to Plaintiff.  (Pl. Opp. 8).  And with respect to Claim Three, Plaintiff argues that it was told that Defendant "could and would" convince CDW to replace Troxell promptly, while in actuality CDW had refused to negotiate and was unwilling to list the Triumph Board on FAMIS.  (*Id.*).

The Court agrees that Plaintiff has failed to meet the requirements to state a claim for fraud or fraudulent inducement under New York law. Beginning with Claim Two, Plaintiff alleges that during the parties' negotiations of the Agreement, it was told that Troxell "might" cease listing the Triumph Board on FAMIS, and that, in that event, Defendant promptly would list the Triumph Board on FAMIS.  (Compl. ¶¶ 30-31).  However, Plaintiff does not allege that those statements were inaccurate at the time they were made.

Rather, Plaintiff merely alleges that at some point before the Agreement was finalized, Troxell stopped listing Triumph Board products on FAMIS, and Plaintiff was not informed of this development.  (*Id.* at ¶ 31).  As such, Plaintiff has not alleged a material misrepresentation under Claim Two.[19]

Moreover, to the extent Plaintiff is alleging that Defendant omitted or concealed a material fact, it must demonstrate that Defendant had a duty to disclose material information and failed to abide by such duty.  *See Nealy* v. *U.S. Surgical Corp.*, 587 F. Supp. 2d 579, 585 (S.D.N.Y. 2008).  A duty to disclose arises where:

> [i] the parties are in a fiduciary relationship; [ii] under the special facts doctrine, where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge; or [iii] where a party has made a partial or ambiguous statement, whose full meaning will only be made clear after complete disclosure.

*Aetna Cas. & Sur. Co.*, 404 F.3d at 582 (citations and internal quotation marks omitted); *see also Miele* v. *Am. Tobacco Co.,* 770 N.Y.S.2d 386, 391 (2d Dep't 2003) ("New York recognizes a cause of action to recover damages for fraud based on concealment, where the party to be charged has superior knowledge or means of knowledge, such that the transaction without disclosure is

---

[19]    Moreover, to the extent Plaintiff alleges that Defendant misrepresented CDW's ability to "promptly" replace Troxell if needed, the Court agrees with Defendant that such statements relate to a future matter outside Defendant's control, and Plaintiff could not justifiably rely on such statements.  *See Nerey* v. *Greenpoint Mortg. Funding, Inc.*, 40 N.Y.S.3d 510, 512 (2d Dep't 2016) ("[W]here the alleged misrepresentation concerns a future matter completely beyond the defendant's control and outside of the defendant's particular knowledge, reliance on the alleged misrepresentation is not justifiable."); *see also F.A.S.A. Constr. Corp.* v. *Degenshein*, 850 N.Y.S.2d 612, 614 (2d Dep't 2008) (rejecting plaintiff's allegation of reliance on misrepresentation related to a "matter completely beyond the defendants' control").

rendered inherently unfair.").  Plaintiff has not alleged a duty to disclose under any of these scenarios.  There are no allegations that the parties were fiduciaries.  As to the special facts doctrine, Plaintiff has not alleged that Defendant knew Plaintiff was entering into the Agreement on the basis of its understanding as to Triumph Board's availability on FAMIS (*see* Compl. ¶ 111) — rather, Plaintiff only appears to have placed an emphasis on FAMIS following the Agreement's execution, when Plaintiff began to take issue with Defendant's approach to the three-bid process (*see id.* at ¶ 34).[20]  Plaintiff also has not alleged any partial or ambiguous statements that required complete disclosure.  Plaintiff was told that Defendant was engaging with CDW about the prospect of listing Triumph Boards on FAMIS (*id.* at ¶ 30), which statement, as alleged in the Complaint, was in fact true (*see id.* at ¶ 85).  Plaintiff has not alleged that Defendant was aware of CDW's later-proffered reasons for its disinterest in listing Triumph Boards on FAMIS, or that Defendant had any reason to expect that CDW would not be willing to replace Troxell.  Accordingly, Plaintiff has failed to plead the existence of a material misrepresentation or omission as to Claim Two.

Plaintiff also has failed to state a claim for fraud as to Claim Three. While Defendant allegedly represented, prior to the finalization of the Agreement, that it promptly would list the Triumph Board with CDW if needed

---

[20]   In fact, Plaintiff alleges that at the time the parties negotiated the Agreement, Defendant was conducting direct sales to customers, in addition to sales through FAMIS.  (*See* Compl. ¶ 29).  This further undermines any contention that Defendant should have known that the Triumph Boards' availability on FAMIS was fundamental to the Agreement.

(Compl. ¶ 30), Plaintiff has not alleged that it relied on any material misstatements by Defendant once the Agreement was in place.  Although Plaintiff inquired on a number of occasions about the status of Defendant's negotiations with CDW, with both Defendant and its outside counsel (*id.* at ¶¶ 34-35, 67, 71, 74, 81), Plaintiff does not allege that either Defendant or its agents made any definitive representations as to those discussions (*see id.* at ¶¶ 35, 71, 82).  Rather, Defendant assured Plaintiff that it would pursue the CDW listing (*id.* at ¶ 35), and its outside counsel indicated that they would "look into" the status of CDW negotiations and share any updates with Plaintiff (*id.* at ¶¶ 71, 82).  And as alleged, Defendant did attempt to pursue the CDW listing, although CDW did not respond to Defendant's overtures.  (*Id.* at ¶ 85). While Plaintiff alleges that in a call on March 15, 2019, Defendant falsely claimed that they were negotiating with CDW, Plaintiff acknowledges in the same breath knowing that this statement "was false" (*id.*), as Plaintiff had itself recently spoken with CDW (*id.* at ¶¶ 83-84).  Thus, even if the March 15, 2019 conversation constituted a false misrepresentation to induce Plaintiff to remain in the Agreement, there was no reliance.  Plaintiff has not otherwise alleged any false misrepresentations regarding the status of the negotiations with CDW.

In sum, Plaintiff has failed to meet the pleading requirements as to Claims Two and Three.  The Court accordingly dismisses both claims.

### 2. The Court Grants Defendant's Motion to Partially Dismiss Claim Five

Defendant next moves to dismiss six of the seven sub-claims brought under Claim Five, which claim encompasses Plaintiff's breach of contract

allegations.  "Under New York law, the elements of a claim for breach of
contract are '[i] the existence of an agreement, [ii] adequate performance of the
contract by the plaintiff, [iii] breach of contract by the defendant, and
[iv] damages.'"  *Abraham* v. *Leigh*, 471 F. Supp. 3d 540, 556 (S.D.N.Y. 2020)
(quoting *Harsco Corp.*, 91 F.3d at 348), *reconsideration denied*, No. 17 Civ.
5429 (KPF), 2020 WL 5095655 (S.D.N.Y. Aug. 28, 2020).  "A breach of contract
claim will be dismissed, however, as being 'too vague and indefinite,' where the
plaintiff fails to allege, in nonconclusory fashion, 'the essential terms of the
parties' purported contract, including the specific provisions of the contract
upon which liability is predicated.'"  *Highlands Ins. Co.* v. *PRG Brokerage, Inc.*,
No. 01 Civ. 2272 (GBD), 2004 WL 35439, at *8 (S.D.N.Y. Jan. 6, 2004) (quoting
*Sud* v. *Sud*, 621 N.Y.S.2d 37, 38 (1st Dep't 1995)).  For the reasons that follow,
the Court dismisses the six challenged breach of contract allegations for failure
to state a claim.

### a.  Plaintiff Fails to Plead Contractual Breaches Related to Sales and Marketing Materials and Customer Inquiries

Defendant first moves to dismiss Plaintiff's claims that Defendant failed
to (i) deliver adequate sales literature and promotional materials, and
(ii) provide Plaintiff with information about customer inquiries, sales leads, or
events.  (Def. Br. 14-16).  As to the first claim, Defendant argues that it was
only required to provide sales and marketing materials "as they [were]
available," and that Plaintiff does not allege any failure to provide existing
materials.  (*Id.* at 15 (referencing Sales Representative Agreement § 3.1)).  As to
the second claim, Defendant argues that it was not required to notify Plaintiff

34

of customer inquiries, particularly given that Plaintiff was its "non-exclusive"

sales representative.  (*Id.* (referencing Sales Representative Agreement § 1.1)).

The Court first addresses Plaintiff's claim that it was not provided

adequate sales literature and promotional materials.  In its opposition brief,

Plaintiff refers the Court to the following allegation:

> When catalogs were provided, they did not have clear or
> accurate information about warranties on hardware
> and software. The catalogs that were sent were not
> branded with VWR, or Triumph Board, but instead were
> branded with "Ward's Science" and included the contact
> information for Dwayne Johnson, after Mr. Johnson
> had left VWR to work for a competitor in the interactive
> white board space months prior, creating confusion for
> customers.

(Compl. ¶ 132).  However, Defendant correctly notes that under the Agreement

it was only required to provide (i) sales and promotional materials "as available"

(*see* Sales Representative Agreement § 3.1), and (ii) upgraded and corrected

materials to the extent such materials were created (*see id.* at § 3.2).  While

Plaintiff's Complaint alleges issues with the materials provided, it does not

allege any breach of Defendant's obligation to provide those materials, *i.e.*, that

any such materials existed but were not promptly provided.  Similarly, with

respect to Plaintiff's claim that Defendant failed to provide Plaintiff with

information about customer inquiries, sales leads, or events, Defendant

correctly observes that it was not obligated to do so under the terms of the

Agreement.  (Def. Br. 14-15).

Implicitly recognizing the problem with its pleadings, Plaintiff

acknowledges that these two sub-claims do not originate from an "express

detailed obligation" in the Agreement, but urges the Court nonetheless to read the Agreement to encompass such an obligation.  (Pl. Opp. 16-18).  Plaintiff argues that this interpretation is consistent with the parties' purpose in making the contract, pursuant to which Plaintiff was required to market and promote Triumph Boards.  (*Id.* at 17).  Indeed, Plaintiff posits the rhetorical question that if Defendant failed to forward its customer inquiries, provide Plaintiff with accurate marketing materials, or provide customers with non-defective products, how could Plaintiff "fulfill the purpose of the contract and fully perform its duties under the contract?"  (*Id.* at 17-18).

In support of this argument, Plaintiff refers the Court to cases emphasizing that courts must consider "the purpose of the parties in making the contract" (Pl. Opp. 17 (citing *Cromwell Towers Redevelopment Co.* v. *Yonkers*, 41 N.Y.2d 1, 6 (1976))) and "[t]he practical interpretation of the contract by the parties, manifested by their conduct subsequent to its formation" (*id.* at 18 (citing *Viacom Int'l, Inc.* v. *Lorimar Prods., Inc.*, 486 F. Supp. 95, 98 n.3 (S.D.N.Y. 1980))).  Tellingly, however, Plaintiff has not cited a single case in which courts have imported such requirements and obligations into an agreement, and the Court will not do so here.  Rather, as Defendant correctly observes, New York courts generally discern parties' intent through the plain language of the agreement, *Crown Wisteria, Inc.* v. *Cibani*, 115 N.Y.S.3d 264, 264 (1st Dep't 2019), particularly where, as here, the parties are "sophisticated business entities," *Cellular Telephone Co.* v. *210 E. 86th Street Corp.*, 839 N.Y.S.2d 476, 480 (1st Dep't 2007).

Put somewhat differently, where the parties negotiated specific requirements and obligations at the time they entered into the Agreement, the Court will not belatedly impose additional requirements upon Defendant. The Court cannot rewrite the Agreement where Plaintiff failed to negotiate for the requirements that it now deems vital to the Agreement's purpose. *See Karabu* v. *Pension Ben. Guar. Corp.*, No. 96 Civ. 4960 (BSJ), 1997 WL 759462, at *14 (S.D.N.Y. Dec. 10, 1997) ("Where, as here, sophisticated parties negotiate at arm's length, the Court cannot and should not rewrite the contract — no matter how poorly drafted — to include language or rights that a party itself was unable to insert."); *Barleo Homes, Inc.* v. *Tudomawr Corp.*, 625 N.Y.S.2d 599, 600 (2d Dep't 1995) ("A court may not rewrite into a contract conditions the parties did not insert, or under the guise of construction, add or excise terms." (citation and internal quotation marks omitted)); *Ingle* v. *Glamore Motor Sales, Inc.*, 490 N.Y.S.2d 240, 242 (2d Dep't 1985) ("It is fundamental that courts enforce contracts and do not rewrite them." (citation and internal quotation marks omitted)). Accordingly, the Court dismisses these two sub-claims.

### b. Plaintiff Fails to Plead Contractual Breaches Related to Price Changes and Customer Deliveries

Defendant next argues that Plaintiff fails to provide sufficient factual support for its allegations that (i) Defendant changed pricing for its RESO A sales without giving Plaintiff notice; and (ii) Defendant breached its obligations to ship purchased products directly to its customers. (Def. Br. 16-17). The Court agrees.

Beginning with Plaintiff's allegations regarding notice of changes in pricing, Defendant refers the Court to correspondence appended to the Complaint in which Defendant appears to have provided its 2019 RESO A pricing on January 30, 2019.  (Def. Br. 16 (citing Compl., Ex. E)).  Defendant further notes that Plaintiff has not alleged any lost sales or damages to support an entitlement to relief on this claim.  (*Id.*).  In response, Plaintiff goes for the capillary, arguing that while it did receive updated pricing from Defendant in January 2019, the pricing was not provided with 30 days prior notice as required under the Agreement.  (Pl. Opp. 15 (citing Sales Representative Agreement § 1.3)).  Even if Defendant failed to provide sufficient notice in compliance with the Agreement, Defendant is correct that Plaintiff has failed to allege any facts establishing damages arising from this breach, as required to state a breach of contract claim under New York law.  (*See* Compl. ¶¶ 130, 149).  *Abraham*, 471 F. Supp. 3d at 556; *see N. Shipping Funds I, L.L.C.* v. *Icon Cap. Corp.*, No. 12 Civ. 3584 (JCF), 2013 WL 1500333, at *8 (S.D.N.Y. Apr. 12, 2013) ("Under New York law, plaintiffs asserting breach of contract claims must allege facts showing damage caused by the alleged breach." (internal quotation marks and citations omitted)); *see also Smith McDonnell Stone & Co.* v. *Delicato Vineyards*, No. 94 Civ. 6474 (JFK), 1995 WL 375918, at *4 (S.D.N.Y. June 22, 1995) ("Allegations of a breach of contract are insufficient in the absence of allegations of facts showing damages."); *Comfort Inn Oceanside* v. *Hertz Corp.*, No. 11 Civ. 1534 (JG) (JMA), 2011 WL 5238658, at *8 (E.D.N.Y. Nov. 1, 2011) ("[A]n allegation that [a claimant] suffered damages without particular facts as

to how [he or] she was damaged does not satisfy *Twombly* and *Iqbal* ....  A claim for breach of contract must rest on more than a conclusory allegation that the defendant's breach caused damages, even where the exact amount of damages is alleged." (internal quotation marks and citations omitted)).  Accordingly, this claim is dismissed.

Turning next to Plaintiff's claim that Defendant breached its obligations to ship purchased products directly to its customers, the Court notes Defendant's argument that the Complaint is devoid of any specific allegations of Defendant's failures of this kind.  (Def. Br. 16-17).  In response, Plaintiff refers the Court to allegations of "numerous missed deliveries due to lack of proper paperwork and lack of communication/coordination" (Pl. Opp. 16 (citing Compl. ¶ 141)), along with allegations that deliveries could not be completed, as schools did not accept "curbside deliveries" and the contractor employed by Defendant had insufficient personnel to handle non-curbside deliveries (*id.* (citing Compl. ¶ 142)).  However, Plaintiff has identified neither specific instances of missed or failed deliveries, nor damages arising from the alleged delivery issues.[21]  Absent supporting factual allegations, these conclusory assertions are plainly insufficient to establish a claim for breach of contract. *See Hadami, S.A.* v. *Xerox Corp.*, 272 F. Supp. 3d 587, 597-98 (S.D.N.Y. 2017) ("[Plaintiff] does no more than list terms in the [agreement] and conclusorily allege that [defendant] violated them.  Such 'naked assertions' of breach do not

---

[21]    Moreover, as Defendant notes, the Agreement does not require Defendant to perform non-curbside deliveries of Triumph Boards.  (Def. Reply 8).

state a claim.”); *Frontline Processing Corp.* v. *Merrick Bank Corp.*, No. 13 Civ.
3956 (RPP), 2014 WL 837050, at *3 (S.D.N.Y. Mar. 3, 2014) (dismissing claims
that failed to specify “how the Defendant allegedly failed to perform on its
contractual obligations”).

### c.   Plaintiff Lacks Standing to Bring Claims for Breaches of Warranties to Customers and Delivery to Customers

Lastly, Defendant argues that Plaintiff’s claims for breaches of warranties
to customers and delivery of defective Triumph Boards to customers require
dismissal for lack of standing.  (Def. Br. 18-19).  Plaintiff alleges that Defendant
delivered defective Triumph Boards to customers (Compl. ¶¶ 144-46), and that
Defendant failed to honor a promise made to certain schools that it would
provide a five-year warranty on software (*id.* at ¶¶ 147-49).  Defendant argues
that Plaintiff lacks standing to litigate purported breaches of Defendant’s
contracts with its customers, as Plaintiff has not established that it is a third-
party beneficiary to such contracts.  (Def. Br. 18-19).  Plaintiff does not
respond to these arguments in its opposition brief (*see* Pl. Opp. 13-19), and the
Court will treat them as conceded.  *See AT&T Corp.* v. *Syniverse Techs., Inc.*,
No. 12 Civ. 1812 (NRB), 2014 WL 4412392, at *7 (S.D.N.Y. Sept. 8, 2014)
(finding that plaintiff’s “silence concedes the point” where it failed to discuss
opponent’s argument in its opposition brief); *In re UBS AG Secs. Litig.*, No. 07
Civ. 11225 (RJS), 2012 WL 4471265, at *11 (S.D.N.Y. Sept. 28, 2012) (same);
*see also Jennings* v. *Hunt Cos.*, 367 F. Supp. 3d 66, 69 (S.D.N.Y. 2019) (“A
district court may, and generally will, deem a claim abandoned when a plaintiff

fails to respond to a defendant's arguments that the claim should be dismissed." (internal quotation marks omitted) (collecting cases)) .

Even were the sub-claims not abandoned, they would fail.  Under New York law, the terms of a contract may be enforced only by contracting parties or intended third-party beneficiaries of the contract.  *See Rajamin* v. *Deutsche Bank Nat'l Tr. Co.*, 757 F.3d 79, 86 (2d Cir. 2014) (citing *Mendel* v. *Henry Phipps Plaza W. Inc.*, 6 N.Y.3d 783, 786 (2006)).  Here, Plaintiff's claim arises from Defendant's alleged breaches of certain obligations to customers stemming from promises or agreements to which Plaintiff has not alleged it was a party.  (*See* Compl. ¶¶ 144-48).  Plaintiff has not established any privity of contract with Defendant with respect to these obligations.  *Cf. Adirondack Combustion Techs., Inc.* v. *Unicontrol, Inc.*, 793 N.Y.S.2d 576, 579 (3d Dep't 2005) (finding that, in action arising from claim of a breach of an implied warranty, "[w]hile plaintiff presents a sales representative agreement between it and defendant to establish privity, that contract ... lacks any contemplation of plaintiff as an end user of the controller device at issue in this matter[,] ... [and] there is nothing that permits the inference that plaintiff and defendant were in privity of contract related to the use of the controller device.").  Alternatively, to position itself as a third-party beneficiary to these agreements, Plaintiff must establish that "the parties to the contract intended to confer a benefit on the third party."  *Subaru Distributors Corp.* v. *Subaru of Am., Inc.*, 425 F.3d 119, 124 (2d Cir. 2005) (citing *Cal. Pub. Emps.' Ret. Sys.* v. *Shearman & Sterling*, 95 N.Y.2d 427 (2000)).  Plaintiff has made no such allegations here.  As such, the

41

Court finds that Plaintiff lacks standing to enforce agreements with customers where it has alleged neither that it was a party nor that it was an intended beneficiary of such agreements.[22]

### 3. The Court Grants Defendant's Motion to Dismiss Claim Four for Failure to State a Claim

Defendant moves to dismiss Claim Four on similar grounds as those discussed with respect to components of Claim Five.  Under Claim Four, Plaintiff alleges that Defendant breached the warranty provided under Section 5.2 of the Sales Representative Agreement that "there was no pending or, to its knowledge, threatened litigation 'with respect to [VWR's] distribution of the Products and/or relationships with its existing supply chain or distribution chain.'"  (Compl. ¶ 120 (quoting Sales Representative Agreement § 5.2)).  In particular, Plaintiff alleges that Defendant was aware of pending or threatened litigation with Troxell regarding "distribution" or the "existing distribution chain."  (*Id.* at ¶ 121).  In the alternative, Plaintiff alleges that the parties intended for Defendant to represent that "there was no known impending or potential interruption in the existing distribution chain."  (*Id.*).  Defendant submits that Plaintiff has not put forth any allegations to support a claim that Defendant was aware of any threatened or pending litigation.  (Def. Br. 17).  As to Plaintiff's alternative theory, Defendant argues that the proposed

---

[22]    Plaintiff separately argues that the Court should read into the Sales Representative Agreement a requirement that Defendant deliver non-defective equipment, such that Plaintiff can maintain that Defendant's delivery of defective Triumph Boards constituted a breach of the Agreement.  (Pl. Opp. 16-19).  For the reasons discussed above, the Court will not rewrite the parties' contract to include this requirement.

implied warranty contradicts the plain language of the Agreement.  (*Id.* at 17-
18).

To begin, Plaintiff argues that it has pleaded that Defendant was aware of
pending or threatened litigation at the time of the Agreement, as "Troxell's
unexplained and sudden termination of its critical role in distributing the
Triumph Board … coupled with CDW's unwillingness to continue the listing of
the Triumph Board, would surely make the existence or threat of litigation not
merely plausible, but highly probable."  (Pl. Opp. 14).  While the Court is
permitted to draw "reasonable inferences from the alleged facts," *Bodum
Holding AG* v. *Starbucks Corp.*, No. 19 Civ. 4280 (ER), 2020 WL 2731987, at *5
(S.D.N.Y. May 22, 2020), the Court agrees that Plaintiff has not alleged any
facts suggesting that Defendant's relationships with Troxell and CDW made the
existence of litigation highly probable.  *See U.S. Bank Nat'l Ass'n* v. *Citigroup
Glob. Mkts. Realty Corp.*, No. 13 Civ. 6989 (GBD), 2014 WL 7714382, at *6
(S.D.N.Y. Nov. 14, 2014) (dismissing claim for breach of contract where
complaint was "rife with conjecture").  In particular, the Court notes that
Plaintiff itself was aware that Troxell might cease listing Triumph Boards on
FAMIS at the time that it entered into the Agreement, suggesting that both
parties viewed that potentiality as consistent with the representations in
Section 5.2 of the Agreement.  (Compl. ¶ 30).

As to Plaintiff's alternative theory of an implied warranty that "there was
no known impending or potential interruption in the existing 'distribution
chain'" (Compl. ¶ 121), Plaintiff puts forth no basis for interpreting the

Agreement to include such a representation.  Plaintiff alleges that at the time it signed the Agreement, it believed that the FAMIS e-catalog was part of Defendant's "existing distribution chain" and that there would not be any interruption to its distribution of Triumph Boards through FAMIS.  (*Id.* at ¶ 122).  As discussed in connection with Claim Five, the Court cannot rewrite the Agreement to include representations that Plaintiff had the opportunity to insert at the time the Agreement was negotiated.  *See Karabu*, 1997 WL 759462, at *14.

Moreover, Section 5.2 merely represents that there was no "pending or threatened litigation related to the distribution chain" — it does not contemplate the significantly broader representation that there was no possible interruption to the distribution chain.  Where Plaintiff has put forth an interpretation of the warranty that is "contrary to the plain words utilized in the contract," and where "language to give effect to that interpretation was readily available had it been the intention of the parties to include such a limitation," the Court can neither add such language into the Agreement nor "construe the language in such a way as would distort the contract's apparent meaning."  *Slamow* v. *Delcol*, 571 N.Y.S.2d 335, 336 (2d Dep't 1991), *aff'd*, 79 N.Y.2d 1016 (1992).  As Plaintiff had not put forth allegations supporting either of its theories underlying Claim Four, the Court must dismiss this claim.

### 4.   The Court Grants Defendant's Motion to Dismiss Claim Six as Duplicative of Claim Five

Defendant moves to dismiss Claim Six, arising from its alleged breach of the implied duty of good faith and fair dealing, on the grounds that this claim

is duplicative of Plaintiff's breach of contract claims.  (Def. Br. 19).  Claim Six
alleges that Defendant's "breaches of its warranties and material breaches of
its contractual obligations severely undermined [Plaintiff's] reputation and ...
ability to sell Triumph Boards.  (Compl. ¶ 151).  Defendant argues that Claim
Six is "redundant" inasmuch as it is based on the same facts underpinning
Plaintiff's breach of contract claims.  (Def. Br. 19).  Plaintiff does not directly
respond to this argument, although it asserts more obliquely that Defendant's
failures to abide by both its express and implied contractual obligations have
caused Plaintiff injury.  (Pl. Opp. 19).

Under New York law, there is a covenant of good faith and fair dealing
implied in all contracts.  *See 511 W. 232nd Owners Corp.* v. *Jennifer Realty Co.*,
98 N.Y.2d 144, 153 (2002).  "This covenant embraces a pledge that neither
party shall do anything which will have the effect of destroying or injuring the
right of the other party to receive the fruits of the contract."  *Id.*  However, "[a]
party may maintain a claim for breach of the implied covenant only if the claim
is based on allegations different from the allegations underlying the
accompanying breach of contract claim."  *Deutsche Bank Secs., Inc.* v. *Rhodes*,
578 F. Supp. 2d 652, 664 (S.D.N.Y. 2008).

As pleaded, Claim Six is entirely duplicative of the breach of contract
claims raised under Claim Five.  Plaintiff alleges no "legal duty separate and
apart from [Defendant's] contractual duties," as required to plead a claim for
breach of the implied covenant of good faith and fair dealing.  *Washington* v.
*Kellwood Co.*, No. 05 Civ. 10034 (DAB), 2009 WL 855652, at *6 (S.D.N.Y.

Mar. 24, 2009).  Rather, Plaintiff references the very same breaches of warranties and contractual obligations alleged in its breach of contract claims. (*See* Compl. ¶ 151).  Where a complaint alleges both a breach of contract and a breach of the implied covenant of good faith and fair dealing arising from the same set of allegations, the latter claim must be dismissed as redundant.  *See Deutsche Bank Nat'l Tr. Co.* v. *Quicken Loans Inc.*, No. 13 Civ. 6482 (PAC), 2014 WL 3819356, at *5 (S.D.N.Y. Aug. 4, 2014) ("Where, as here, 'the conduct allegedly violating the implied covenant is also the predicate for breach of covenant of an express provision of the underlying contract,' 'a claim for breach of the implied covenant will be dismissed as redundant.'" (quoting *Nat'l Gear & Piston, Inc.* v. *Cummins Power Sys., LLC*, 861 F. Supp. 2d 344, 365 (S.D.N.Y. 2012)); *see also Lorterdan Props. at Ramapo I, LLC* v. *Watchtower Bible & Tract Soc'y of N.Y., Inc.*, No. 11 Civ. 3656 (CS), 2012 WL 2873648, at *8 (S.D.N.Y. July 10, 2012) ("Even where the breach of contract claim is dismissed, the good faith/fair dealing claim will be dismissed if it is redundant."). The Court accordingly dismisses Claim Six as duplicative of Claim Five.

### 5.    The Court Grants Defendant's Motion to Dismiss Claim Seven as Duplicative of Claim Five

Defendant similarly moves to dismiss Claim Seven, which seeks indemnification pursuant to the Agreement's Indemnification Clause.  (Def. Br. 19-21 (discussing Sales Representative Agreement § 5.4)).  Defendant argues that there is no "unmistakably clear" language in the Agreement providing an obligation to cover "first-party" claims.  (*Id.* at 20 (citing *Lehman XS Tr., Series 2006-GP2 by U.S. Bank Nat'l Ass'n* v. *GreenPoint Mortg. Funding,*

*Inc.*, 916 F.3d 116, 125-26 (2d Cir. 2019) ("*Lehman*"))).  Plaintiff disagrees, and argues that the Indemnification Clause does include such "unmistakably clear" language.  (Pl. Opp. 21-23).

Under New York law, indemnification clauses "must be strictly construed so as not to read into [them] any obligations the parties never intended to assume."  *Haynes* v. *Kleinewefers & Lembo Corp.*, 921 F.2d 453, 456 (2d Cir. 1990).  Where an indemnification clause "extends only to a plaintiff's actions in a specific capacity or to specific types of losses, that limitation will be given effect."  *BNP Paribas Mortg. Corp.* v. *Bank of Am., N.A.*, 778 F. Supp. 2d 375, 415 (S.D.N.Y. 2011).  Moreover, the Second Circuit has determined that "under New York law, absent 'unmistakably clear' language in an indemnification provision that demonstrates that the parties intended the clause to cover first-party claims, an agreement between two parties 'to indemnify' each other does not mean that one party's failure to perform gives rise to a claim for indemnification."  *Lehman*, 916 F.3d at 125 (quoting *Bridgestone/Firestone, Inc.* v. *Recovery Credit Servs., Inc.*, 98 F.3d 13, 21 (2d Cir. 1996)).

As noted above, the Indemnification Clause provides that, among other things, Defendant is required to indemnify Plaintiff from all claims and damages arising out of:

> (i) any alleged infringement or violation by [VWR] of any … proprietary rights of any third party, or (ii) third party claims related to any claims made by [VWR] about [its] Product, effectiveness or warranty, or (iii) breach by [VWR] of any term or provision of this Agreement, or (iv) wrongful or negligent act or omission by any of [VWR] or its officers, directors, shareholders, agents, servants, employees and representatives.

(Sales Representative Agreement § 5.4).  Plaintiff observes that while certain sub-clauses in the provision expressly reference third-party claims, Sections 5.4(iii) and (iv) do not include such language.  (Pl. Opp. 23).  From this, Plaintiff reasons that the absence of language referencing "third-party claims" in Sections 5.4(iii) and (iv) necessarily means that these clauses provide Plaintiff with the right to bring a first-party action.  (*Id.*).  In so arguing, Plaintiff misreads the relevant caselaw.  The fact that Sections 5.4(iii) and (iv) lack language referencing "third party claims" does not lead to the inference that those provisions support a right to a first-party action.  Rather, the provisions must refer "exclusively or unequivocally" to claims between Plaintiff and Defendant to cover first-party claims.  *BNP Paribas Mortg. Corp.*, 778 F. Supp. 2d at 415.  There is no such exclusive or unequivocal language here.  Absent such language, "[w]here parties agree to 'indemnify' each other for losses incurred by a breach of contract, where those lo[s]ses do not relate to liability to a third party, the characterization of 'indemnification' is no more than an epithet for recovery for breach of contract."  *Lehman*, 916 F.3d at 126 (alterations in *Lehman*) (quoting *Xerox State & Local Sols., Inc.* v. *Xchanging Sols. (USA), Inc.*, 216 F. Supp. 3d 355, 364 (S.D.N.Y. 2016)).  The Court thus dismisses the indemnification claim as duplicative of Plaintiff's breach of contract claims.  *See Genius Media Grp., Inc.* v. *Google LLC*, No. 19 Civ. 7279 (MKB), 2020 WL 5553639, at *10 n.5 (E.D.N.Y. Aug. 10, 2020), *appeal filed*, No. 20-3113 (2d Cir. Sept. 14, 2020).

###### 6.     The Court Denies Defendant's Motion to Dismiss Claim Eight

Defendant moves to dismiss Claim Eight, which demands an audit pursuant to Section 8.2 of the Agreement, on the grounds that Plaintiff lost any such right upon its termination of the Agreement.  (Def. Br. 21).  Plaintiff responds that it made this demand prior to the Agreement's termination, and suggests that Defendant's reading of the contract would permit a party to steal from its counterparty and abscond successfully by refusing to provide an accounting prior to an agreement's termination.  (Pl. Opp. 24).

The Court finds that Plaintiff demanded an audit prior to the termination of the Agreement.  The Agreement provided that it could be terminated "at the election of one party following material breach … by the other party," should the breach not be cured within 30 days "following written notice of such breach."  (Sales Representative Agreement § 6.2).  Plaintiff provided notice of Defendant's alleged breach in its April 3, 2019 letter, the same letter in which it demanded an audit.  (Compl. ¶¶ 91-92; *see also* Termination Letter 2 ("Pursuant to Section 8.2 of the Agreement we demand an audit[.]")).  The Agreement terminated 30 days thereafter, in accordance with Section 6.2.  (*See* Termination Letter 8 ("As a result of the above misrepresentations and breaches … this contract will terminate by [its] terms 30 days from the date of this letter.")).  Accordingly, Claim Eight will not be dismissed where Plaintiff demanded an audit prior to the Agreement's termination.

### 7.     The Court Dismisses Plaintiff's Demands for Lost Profits and Punitive Damages

Finally, Defendant seeks to limit Plaintiff's damages claims.  Plaintiff's Complaint seeks compensatory damages of no less than $11,000,000 on Claims One, Three, Five, Six, and Seven.  (Compl. 57-58).  As to its fraud allegations brought under Claims Two and Three, Plaintiff seeks punitive damages.  (*Id.* at 57).  However, as the Court has dismissed Claims Two and Three, it grants Defendant's motion to dismiss Plaintiff's demand for any associated punitive damages.

To the extent that Plaintiff's damages figure includes lost profits, Defendant argues that such claims are prohibited by the terms of the Agreement.  (Def. Br. 21-23; Def. Reply 4-5).  Specifically, Defendant submits that Plaintiff is barred from seeking lost profits under provisions in the Agreement that limit the parties' liability.  (Def. Br. 21-23).  Plaintiff does not directly respond to this argument in its opposition briefing, and the Court will consider this point conceded.  *See AT&T Corp.*, 2014 WL 4412392, at *7.[23]

The Court agrees with Defendant that lost profits are expressly barred under the Section 6.4 of the Agreement, which states that upon the Agreement's termination, Plaintiff "will not be entitled to receive any …. actual consequential, indirect, special or incidental damages, costs or expenses, whether foreseeable (including, but not limited to, claims related to … *loss of*

---

[23]     Although Point III of Plaintiff's opposition brief is titled: "VWR Is Wrong About the Availability of Punitive Damages and Lost Profits Damages in This Case" (Pl. Opp. 19), the ensuing section does not directly address Defendant's arguments about lost profits (*see id.* at 19-21).

*profits*).'" (Sales Representative Agreement § 6.4 (emphasis added)).  Plaintiff

has put forth no basis for finding this clause unenforceable.  Moreover, New

York courts "routinely enforce[] liability-limitation provisions when contracted

by sophisticated parties, recognizing such clauses as a means of allocating

economic risk in the event that a contract is not fully performed." *Process Am.,*

*Inc.* v. *Cynergy Holdings, LLC*, 839 F.3d 125, 138 (2d Cir. 2016) (collecting

cases).  While such provisions will be set aside "when the conduct at issue

involves gross negligence or willful misconduct," *Morgan Stanley & Co.* v. *Peak*

*Ridge Master SPC Ltd.*, 930 F. Supp. 2d 532, 544 (S.D.N.Y. 2013), Plaintiff

makes no argument that it has alleged such a "compelling demonstration of

egregious intentional behavior" as required to meet this standard, *id.* at 545;

*see also Net2Globe Int'l, Inc.* v. *Time Warner Telecom of N.Y.*, 273 F. Supp. 2d

436, 454 (S.D.N.Y. 2003) (describing the wrongful conduct that would lead to

nullifying a liability limitation provision as "nothing short of a compelling

demonstration of egregious intentional misbehavior evincing extreme

culpability: malice, recklessness, deliberate or callous indifference to the rights

of others, or an extensive pattern of wanton act").[24]  The Court agrees with

Defendant that lost profits damages are barred under the Agreement.

---

[24]     Plaintiff states merely that it has alleged "intentional or grossly negligent misconduct"
and that "those allegations must be taken as true." (Pl. Opp. 21).  But this conclusory
argument, untethered from any discussion of either the relevant allegations or the
applicable standard, does not suffice to establish the required "compelling
demonstration of egregious intentional misbehavior."  *See Net2Globe Int'l, Inc.* v. *Time*
*Warner Telecom of N.Y.*, 273 F. Supp. 2d 436, 454 (S.D.N.Y. 2003).

### 8. The Court Denies Leave to Amend

"Rule 15(a)(2) of the Federal Rules of Civil Procedure provides that a court 'should freely give leave [to amend] when justice so requires.'" *Gorman* v. *Covidien Sales, LLC*, No. 13 Civ. 6486 (KPF), 2014 WL 7404071, at *2 (S.D.N.Y. Dec. 31, 2014) (quoting Fed. R. Civ. P. 15(a)(2)).  Consistent with this liberal amendment policy, "'[t]he rule in this Circuit has been to allow a party to amend its pleadings in the absence of a showing by the nonmovant of prejudice or bad faith.'"  *Id.* (alteration in *Gorman*) (quoting *Block* v. *First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993)).  That being said, "it remains 'proper to deny leave to replead where ... amendment would be futile.'"  *Id.* (quoting *Hunt* v. *All. N. Am. Gov't Income Tr., Inc.*, 159 F.3d 723, 728 (2d Cir. 1998)).

Plaintiff has not sought leave to amend, and the Court believes that any amendment would be futile.  Moreover, Plaintiff was provided with notice of the deficiencies in its pleadings prior to briefing the instant motion, in the form of Defendant's pre-motion letter (*see* Dkt. #14), but forewent the opportunity to amend at that time.  For these reasons, the Court's partial dismissal of the claims discussed above is with prejudice.  *See Gallop* v. *Cheney,* 642 F.3d 364, 369 (2d Cir. 2011) ("[N]o court can be said to have erred in failing to grant a request [to amend] that was not made."); *cf. Payne* v. *Malemathew*, No. 09 Civ. 1634, 2011 WL 3043920, at *5 (S.D.N.Y. July 22, 2011) ("That Plaintiff was provided notice of his pleading deficiencies and the opportunity to cure them is sufficient ground to deny leave to amend *sua sponte*.").

**CONCLUSION**

For the reasons set forth in this Opinion, Defendant's partial motion to dismiss is GRANTED in part and DENIED in part.  The Court dismisses with prejudice Claim Two; Claim Three; Claim Four; Claim Five, excluding Plaintiff's allegations relating to Defendant's breaches regarding notification of purchases and payment of commissions; Claim Six; and Claim Seven; as well as Plaintiff's demand for punitive damages; and any demand for lost profits, to the extent such damages are sought by Plaintiff.  The Clerk of Court is directed to terminate the motion at docket entry 18.  The parties are directed to submit a joint letter and Proposed Case Management Plan and Scheduling Order on or before April 9, 2021.

SO ORDERED.

Dated:  March 26, 2021
New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge